## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

COLLINS INKJET CORPORATION,                          Case No.: 1:13CV664

        Plaintiff,                                 Judge Michael R. Barrett

   v.

EASTMAN KODAK COMPANY,

        Defendant.

### OPINION AND ORDER

This matter is before the Court on Plaintiff Collins Inkjet Corporation's ("Collins") Motion for Preliminary Injunction, and its Amended Revised Memorandum in Support. (Doc. 2; Doc. 33). Defendant Eastman Kodak Company ("Kodak") has filed a Response in Opposition (Doc. 32), and Collins has filed a Reply (Doc. 35). The Court held a preliminary injunction hearing on December 2-4, 2013. Following the hearing, the parties separately submitted proposed findings of fact and conclusions of law. (Doc. 88; Doc. 89). This matter is now ripe for review.

## I.   FACTUAL BACKGROUND

This case concerns two companies – Eastman Kodak Company ("Kodak") and Collins Inkjet Corporation ("Collins") – that formerly were working together to manufacture and distribute Versamark ink. They currently are each other's sole competitor in that sales area. The essence of this case is that upon the companies' separation from one another, Kodak created a policy that increased the price for essential refurbishment services that Collins does not offer, but only for those customers who continued to use Collins-brand Versamark ink. Those customers who used or switched to Kodak-brand Versamark ink were not subject to the increased fee. The basic background facts leading up to this dispute are as follows.

1

### A.  <u>Kodak</u>

Kodak is a printing and imaging company.  (Doc. 38, ¶11).  Kodak provides a range of products and services.  (*Id.*)  Today, Kodak's primary business is packaging, graphic communications, and functional printing.  (*Id.*, ¶12).  Two of its product lines include Versamark and Prosper.  (Doc. 38, ¶¶ 13-14, 23).  Versamark is a commercial inkjet product line that uses continuous inkjet printing.  (Doc. 38, ¶ 14; Tr. 2-170).  Versamark printing systems can be sold as a full press or as partial components to a press.  (Tr. 2-176 – 2-177; Doc. 38, ¶ 21).  The printers cost millions of dollars, and have an estimated useful lifecycle of anywhere between ten years and twenty years.  (Tr. 2-104, 2-109, 2-139).  The printheads are components to the Versamark printers that come in different sizes, usually referred to by their model numbers.  (Tr. 1-118-119).  In addition, Kodak manufactures Versamark parts, Versamark ink, and other fluids for Versamark printers.  (Doc. 38, ¶21).  Versamark ink is specialized ink that is manufactured for use in Versamark printers.  (Doc. 30, ¶21; Tr. 1-8).  Kodak also provides printhead refurbishment services to Versamark customers; it is the only company that currently provides such services.  (Tr. 1-14).  The cost of purchasing refurbished printheads is a large annual cost to customers.  (Tr. 2-40).

The last time Kodak sold a new Versamark press was in 2009, even though it continues to sell Versamark components.  (Tr. 2-176).  Kodak touts its new Prosper system as a new and improved technology that is replacing Versamark printers.  (Tr. 2-172).  It contends it is the future of its inkjet business.  (Tr. 2-172).  ███████████████████████████

███████████████████████████████████████████████████████████

████████████████████  Kodak regards its Versamark customers as prime prospects for buying Prosper systems.  (Tr. 2-175).

## B.    Collins

Collins is a business that manufactures and distributes inkjet ink for industrial inkjet printing applications. (Tr. 1-4). One of the types of specially designed ink it manufactures and distributes is for the Versamark printers. (Tr. 1-8). Versamark ink now comprises over 60% of its total ink production. (Tr. 1-12). Yet, it has more actual sales for its Hewlett Packard Lexmark ink cartridges. (Tr. 1-59 – 1-60). The only other company manufacturing Versamark ink is Kodak. (Tr. 1-12). Collins currently does not provide printhead refurbishment services to its customers. (Tr. 1-14 – 1-15). However, it is working on developing those services. (Tr. 1-14 - 1-18). It has expended a significant amount of time and money in its effort, but has not yet been able to enter into that market. (Tr. 1-18). Its anticipated date for being able to enter the market is not clear, but Collins predicts it will not be any time in 2014. (Tr. 1-14 – 1-17).

## C.    Versamark Customers

Versamark customers generally are large commercial printers. They are very focused on their total cost of print or production ("TCOP"). (*See* Tr. 2-68; Tr. 2-187). TCOP includes the up-front investment in the printing system as well as the consumables needed to print each page, including ink, printhead refurbishment, paper, service, labor and more. (Tr. 2-68, 2-181).

Versamark customers often own multiple printing technologies. Several Kodak customers have switched out some or all of their Versamark systems for other digital printing systems, including systems not owned by Kodak. (*See* Tr. 2-180; Herman Tr. 36-40; DX11).

## D.    Relationship Between Kodak and Collins

From the 1990s through 2001, Kodak (formerly Scitex) and Collins competed directly for market share of Versamark ink sales. (Doc. 40, ¶ 7). In 1997, the parties discussed entering an agreement. (Tr. 1-20 – 1-21, 1-60; DX36). According to Kodak, the discussions occurred

because Scitex was concerned about Collins putting untested ink into its customers' printers. (Doc. 40, ¶¶ 7-9).  Yet, according to Collins, the discussions occurred because Scitex realized Collins was successful in converting customers to Collins through price concessions and exceptional customer service.  (Tr. 1-18 – 1-21).  In a letter to Scitex, Mr. Gamblin of Collins acknowledged that Scitex had concern "over having control over the fluids going into their systems."  (DX36).  He proposed that Scitex exit the ink business and rely on Collins to manufacture inks for Versamark printers.  (*Id.*)  Scitex replied that the beneficial first step would be for Collins to start testing its ink, and offered to sell Collins the testing equipment.  (DX28). Collins declined, citing its ink reliability and the lack of clarity on how the testing would improve profitability, which ended the discussions at that time.  (DX29).

In 2001, the parties entered into the first of four Supply and Reseller Agreements, the last of which was the 2008 Agreement.  (DX16; DX17; DX37).  Under the Agreements, Collins manufactured the majority of both companies' Versamark inks in return for granting Kodak the right to resell Collins-branded Versamark inks.  (Tr. 1-22, 1-65, 1-67).  Collins made contact with new customers as a result of the Agreement.  (Tr. 1-66).  During this period, Collins used its own formulas and quality assurance procedures for Collins-branded Versamark ink, which included predictive testing and other quality control tests.  (Tr. 1-8 – 1-10; Tr. 1-22 – 1-24).  For Kodak-branded Versamark ink, Kodak provided Collins with the formulas and quality assurance procedures Kodak used so that Collins could manufacture that ink.  (Tr. 1-22).  Kodak also provided Collins with print testing equipment so that it could conduct some print testing.  (Tr. 1-76 – 1-81). Kodak was permitted under the Agreement to print test Collins' ink.  (Tr. 1-76 – 1-81).

Collins did not have the ability to create inkdexes for its nine-inch inks. (Tr. 1-81; Tr. 2-262). An inkdex is a software file that tells the printer how to run a particular ink. (Tr. 2-262). Once Collins sold a certain amount of a nine-inch ink, it would send it to Kodak to create an inkdex. (Tr. 1-76 – 1-81).

One issue that arose during the time of the Agreement was with DST. DST had a problem with one of its printheads, and Kodak gave Collins more testing equipment. (Tr. 1-78). Kodak, Collins and DST also arranged for testing by Kodak of the inks Collins was formulating for DST. (Tr. 1-78 – 1-79; Doc. 39, ¶¶ 11-13). Kodak continued to test some of the inks going to DST over a period of several years. (Tr. 1-78; Doc. 39, ¶¶ 11-13).

A second issue arose with Harte Hanks. (Tr. 2-4). Harte Hanks did not believe the problem was ink, but Kodak believed that one problem was associated with how the high temperatures affected Collins ink and that a second problem was associated with the inkdex that Collins provided to the customer. (Tr. 2-13 – 2-14). To assist in resolving the issue, Collins sent a cube of ink to Harte Hanks to eliminate the possibility that the problem was with a particular batch of ink. (Tr. 2-4). Harte Hanks ultimately switched to Kodak-branded Versamark ink. (Tr. 2-14 – 2-15).

A couple other similar incidents are alleged to have occurred during the life of the Agreement. (Doc. 40, ¶ 24; DX47).

In October 2011, Collins attempted to terminate the latest Supply and Reseller Agreement. Collins claims it did so due to concerns about Kodak's outstanding payables and possible insolvency. (Tr. 1-27 – 1-28). Kodak claims Collins did so because Kodak refused to partner with Collins with respect to the development of inks for Kodak's Prosper system. (Tr. 1-

71 – 1-72; DX18; DX91).  The termination of the Agreement would be a significant loss of annual margin for Kodak.  (PX3, p. 14).

However, the termination was not effective immediately because Collins had to provide Kodak with six-month's notice under the terms of the Agreement. (DX16, § 10.03).  To enforce that provision, Kodak sought and received a preliminary injunction in the United States District Court for the Western District of New York.  (DX21).

On January 19, 2012, Kodak filed a voluntary petition for relief under the United States Bankruptcy Code.  It successfully emerged from Chapter 11 bankruptcy protection as a transformed company on September 3, 2013.  (DX111).

Between October 2011 and May 2012, Kodak expanded its manufacturing capabilities. (Doc. 38, ¶ 51). ███████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ The Agreement officially terminated on May 2, 2012.

On May 3, 2012, Kodak issued a press release that indicated Collins "is no longer an approved supplier of inks and fluids for Kodak Versamark printing systems" and that "only Kodak can engineer, optimize system fluid consumption, and test inks for Kodak Systems prior to customer order."  (PX18).  Kodak announced to customers that Kodak was implementing a new pricing policy that differentiated the price paid by Collins' customers and Kodak's customers for printhead refurbishment (the "May 2012 Policy").  (PX19).  Collins' customers paid the higher "non-matched" price while Kodak's customers paid the lower "matched" price.  (PX19). The key differences were that Collins' customers were charged a higher base fee, had to pay hourly rates during the "no-charge" refurbishment period that Kodak customers received, and lost their equipment warranty for using Collins-branded Versamark ink.  (PX19).

Kodak claims that in implementing the policy, it had to be concerned about exploiting customers who may be future purchasers of Prosper equipment, and about significantly increasing its customers' overall costs.  (Tr. 2-179 – 2-180; Doc. 43, ¶ 10).  Kodak also recognized that, among others, some of the benefits of the policy included "protect[ing] [the] Versamark category that drives [almost half of it inkjet products group's] annuity revenue[,] having "[l]ost ink customers come back to Kodak[,]" and recapturing "lost ink revenue." (PX6, PX9; PX12; Tr. 2-42).  Kodak contends that it implemented the policy to address concerns regarding its reputation for providing long-term equipment support, its ability to maintain revenues for that long-term support, and its reputation for providing high quality equipment and support.  (Tr. 2-24 – 2-25, 2-68, 2-177).

The May 2012 Policy was never officially implemented, as many customers pushed back against the Policy.  (Tr. 2-64 – 2-65).  However, at least one customer signed on to switch and at least ten other made verbal commitments or made progress towards switching to Kodak once the policy was announced.  (*See* PX6; PX15; PX22).

In December 2012, DST reported to Kodak that it was returning an increased number of four-inch printheads for refurbishment.  (Tr. 2-224).  An unusual amount of yellow ink residue was found inside the printheads.  (Tr. 2-225).  DST advised Kodak that a Collins ink had been run through the printhead.  (Tr. 2-228; DX72).  However, there also is some evidence of printhead life problems associated with certain printheads furnished by Wuxi.  (Tr. 2-249 – 2-252).

In mid-2013, a Chinese company, Cifang, complained to Kodak about early life printhead failures.  (Tr. 2-252 – 2-253).  An analysis revealed multiple problems at the Cifang site, but it

7

appeared that the only printheads experiencing early life failures were those running Collins ink with an incorrect inkdex. (Tr. 2-85 – 2-86).

In July 2013, Kodak began announcing a modified pricing policy (the "July 2013 Policy"). (See PX65). Under the July 2013 Policy, matched customers would be charged a lower hourly rate and would receive a longer no-charge refurbishment period. (PX65). Although non-matched customers would pay less than what they would have under the May 2012 Policy for refurbishment, they still would pay at least 30% more than matched customers. (PX65; PX66; Tr. 2-93). In its announcements, Kodak identified the reasons for the action as follows: "[O]ver the last 6 months our customers have experienced damaged printheads as direct result of using 3rd-Party inks and fluids [which] . . . has caused disruption to our customers' printing operations and required the replacements of printheads." (PX65; *see also* PX66).

Although the July 2013 Policy was supposed to be effective August 1, 2013, Kodak pushed that effective date back for some customers until November 1, 2013. (Tr. 2-55). As of November 1, 2013, Kodak instructed its sales force to ensure enforcement of the new policy. (Tr. 2-215). However, a select group of large customers were offered rebates of the penalty if they switched to Kodak in the future and still have not been charged the unmatched rates. (Tr. 2-50, 2-70 – 2-71). Those large customers "represent the majority of ink volume and revenue." (Tr. 2-71). Most large customers still were ordering from Collins. (Tr. 1-89 – 1-90).

## II.     PRELIMINARY INJUNCTION STANDARD

Under Federal Rule of Civil Procedure 65, injunctive relief is an extraordinary remedy, the purpose of which is to preserve the status quo. In determining whether to grant or deny a preliminary injunction, this Court must consider four factors: 1) whether the movant has a strong likelihood of success on the merits; 2) whether the movant would suffer irreparable injury

without the injunction; 3) whether issuance of the injunction would cause substantial harm to others; and 4) whether the public interest would be served by the issuance of the injunction. *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 432 (6th Cir. 2004) (quoting *Blue Cross & Blue Shield Mut. of Ohio v. Blue Cross & Blue Shield Ass'n.*, 110 F.3d 318, 322 (6th Cir. 1997)).  The foregoing factors are not prerequisites, but rather are factors that the Court should balance.  *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004).  "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

## III.  ANALYSIS

To determine whether a preliminary injunction should issue, the Court examines each of the four factors.

### A.  Likelihood of Success on the Merits

Although the Court is required to balance each of the four factors, a preliminary injunction should not issue unless there is a likelihood of success on the merits.  *Michigan State v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997).  To show a likelihood of success, a plaintiff must demonstrate more than a mere possibility of success, but it need not "prove [its] case in full." *Northeast Ohio Coalition v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012) (quoting *Certified Restoration Dry Cleaning Network v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007)).  "'[I]t is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation.'"  *Northeast Ohio Coalition*, 696 F.3d at 591 (quoting *Six Clinics Holding Corp., II v. Cafcomp Sys.,* 119 F.3d 393, 402 (6th Cir. 1997)).

9

## 1.  **Unlawful tying under Sherman Act, 15 U.S.C. § 1**

Collins alleges that Kodak has violated Section 1 of the Sherman Act through an impermissible tying arrangement.  In particular, Collins contends that Kodak has illegally tied the sale of Kodak-branded Versamark ink to the price for Kodak's refurbishment services.  Collins contends that the tie is per se unlawful.

Section 1 of the Sherman Act prohibits certain "tying arrangements."  15 U.S.C. § 1. A tying arrangement is per se unlawful when:  1) there are two separate products or services; 2) the sale of one of the products is conditioned on the purchase of the other product; 3) the seller has appreciable economic power in the market for the tying product; and 4) the arrangement affects a "substantial volume" of commerce in the tied market.  *PSI Repair Servs. v. Honeywell, Inc.*, 104 F.3d 811, 815 (6th Cir. 1997) (quoting *Eastman Kodak Co. v. Image Technical Servs.*, 504 U.S. 451, 456, 462, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992)) (internal quotations omitted).  "Even if a per se violation is established, a defendant may prevail by showing a substantial business justification for the tie-in."  *Virtual Maintenance v. Prime Computer*, 957 F.2d 1318, 1323 (6th Cir. 1992) ("*Virtual Maintenance I*"), *vacated and remanded on other grounds*, 506 U.S. 910, 113 S. Ct. 314, 121 L. Ed. 2d 235 (1992).

Here, only the last three elements are in dispute, as the parties do not contest that the tying and tied products are distinct.[1]  Kodak also contends it has legitimate business justifications that preclude a finding of a tie.

### a.     Factor Two:  Conditioning

"The essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied

---

[1] Defendants concede this point in the Proposed Findings of Fact and Conclusions of Law.  (Doc. 88, p. 68).

product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms.'"  *Eastman Kodak*, 504 U.S. at 464 (quoting *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 80 L. Ed. 2d 2, 104 S. Ct. 1551 (1984)).  Although the traditional tie is explicitly imposed by agreement, courts have found tying arrangements where it can be inferred from the circumstances that the seller has coerced the buyer to purchase, or not to purchase, a product.  *See Shamrock Mktg., Inc. v. Bridgestone Bandag, LLC*, 775 F. Supp. 2d 972, 980 n. 7 (W.D. Ky. 2011) (indicating that courts have recognized non-explicit ties, and citing relevant cases); *see also Advanced Computer Servs. of Mich. v. MAI Sys. Corp.*, 845 F. Supp. 356, 368 (E.D. Va. 1994) ("'[I]n the absence of an explicit agreement requiring the purchase as a condition of the sale, courts will accept proof suggesting any kind of coercion by the seller or unwillingness to take the second product by the buyer.'") (quoting J. Shenefield & I. Stelzer, The Antitrust Law: A Primer 72 (1993)); *Tic-X-Press, Inc. v. Omni Promotions Co.*, 815 F.2d 1407, 1418 (11th Cir. 1987) ("It is well established that coercion may be established by showing that the facts and circumstances surrounding the transaction as a practical matter forced the buyer into purchasing the tied product.").  The Sixth Circuit, in particular, has recognized non-explicit tying arrangements when a deal induces "all rational buyers" of the tying product to accept the tied product.  *Virtual Maintenance I*, 957 F.2d at 323.[2] While there is no clearly articulated method for determining whether "all rational buyers" would be induced to accept the tied product, courts in this circuit have approached the issue in two ways.  *See Virtual Maintenance I*,

---

[2] Some courts outside the Sixth Circuit, however, have used the "only viable economic option" standard. More specifically, those courts have found tying arrangements where the buyer's "only viable economic option" is to purchase both the tying and the tied product.  *See Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1180 (1st Cir. 1994), *abrogated on other grounds by*, *Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237, 176 L. Ed. 2d 18 (2010); *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1500 (8th Cir. 1992).  In one Eastern District of Michigan case, the district court accepted a "synthesized" standard of the Sixth Circuit's standard and the "only viable economic option" standard, requiring that the plaintiff show there was "no economically practical option" other than to buy the tied product. *Valassis Commc'ns, Inc. v. News Am. Inc.*, No. 2:06-cv-10240, 2011 U.S. Dist. LEXIS 66672, at *17 (E.D. Mich. Jan. 24, 2011), *adopted by*, 2011 U.S. Dist. LEXIS 62495 (E.D. Mich. June 15, 2011).

957 F.2d at 1323; *Virtual Maintenance v. Prime Computer,* 11 F.3d 660, 666-67 (6th Cir. 1993) ("*Virtual Maintenance II*"); *Shamrock Mktg.*, 775 F. Supp. 2d at 980-81.

The first approach looks at the price differential between the tied product and the competing product. *Virtual Maintenance I*, 957 F.2d at 1323; *Virtual Maintenance II*, 11 F.3d at 666-67. In *Virtual Maintenance I*, Prime Computer was a manufacturer of a hardware system known as the Prime 50 Series minicomputer. *Virtual Maintenance I*, 957 F.2d at 1321. Prime Computer also was the exclusive distributor of a computer software design program owned by Ford Motor Company. *Id.* at 1322. Ford required designers of Ford automobiles to use only the newest version of the program, which ran only on Prime's 50 Series minicomputer. *Id.* Prime Computer also sold the software support necessary to ensure that the designers had the latest version of the program. *Id.* That software support was sold by Prime as part of a package that included Prime Computer's hardware maintenance of the minicomputers on which the program runs. *Id.* Although the automobile companies could buy the hardware maintenance elsewhere, the cost of the total package from Prime Computer was $16,000 per year while the cost of the software support without the hardware maintenance varied from $80,000 to $160,000 per year. *Id.* The Sixth Circuit held that the large price differential induced all rational buyers of Prime's software support to accept its hardware maintenance. *Id.* at 1323.

Utilizing the price-differential approach, Collins has demonstrated a likelihood of success in proving that Kodak's refurbishment policy creates a significant price differential between using Kodak for both Versamark ink and refurbishment services and using Collins for Versamark ink while using Kodak's refurbishment services. While the economists both manipulate the data and the timeframes to best suit their respective positions, the reality is that a Collins-brand ink customer pays significantly more for refurbishment services than a Kodak-

brand ink customer under the July 2013 Policy.  To exemplify, Collins has presented evidence that a hypothetical customer's total cost for refurbishment under the "matched" policy would be $135,654.  (PX1, ¶51).  That same hypothetical customer would pay $201,278 if it purchased the refurbishment service separately from Kodak under the "non-matched" policy.  (PX1, ¶51; PX108). That is a $65,624 difference in costs to purchase the refurbishment service independent of the Kodak-branded Versamark ink.  (PX1, ¶51; PX108).  Even considering that a non-matched ink user would receive lower ink prices, that customer still would pay $48,901 more than a matched customer.  (PX1, p. 19; PX108).  Other hypothetical examples bring about similar results where the non-matched customer would pay approximately $12,600 to $40,500 more for refurbishment, even factoring in the lower cost of third-party ink.  (PX1, ¶51; PX108). Although the incentive here does not quite match the one in *Virtual Maintenance*, the significant price differential could induce all rational buyers of Versamark ink, and especially highly cost-sensitive Versamark customers, to purchase Versamark ink from Kodak rather than a third party.

The second approach considers the extent to which buyers continue to purchase products outside the tie.  *Shamrock Mktg.*, 775 F. Supp. 2d at 980-81.  The district court in *Shamrock* considered whether buyers continued to purchase products outside the tie in determining whether a tying arrangement existed.  *Id*.  The plaintiff in *Shamrock* was a corporation that supplied "curing envelopes" and other accessories to tire retreading shops, including to the defendant's franchisees. *Id.* at 976.  The defendant, however, had entered into a franchise agreement with 300 of its dealerships that indicated that the franchisees had to purchase or lease all of their "tire retreading equipment and machinery." *Id.* at 977.  The defendant then created a Q-Fund in which all franchisees had to participate, and which provided credits to franchisees for certain procured tread rubber purchases for subsequent purchases of other accessories, including curing

envelopes, from defendant.  *Id.* The franchisees did not have to use the credits and could purchase curing envelopes and other accessories from third parties.  *Id.* The district court determined that since the plaintiff claimed a 90% decline in curing envelope sales to the defendant franchisees since implementation of the Q-fund, it was plausible that all rational buyers would be induced to purchase the defendant's curing envelopes.  *Id.* at 981.  It therefore determined that the plaintiff had met its burden at the motion to dismiss stage.  *Id.*  It noted, however, that the "all rational buyers" standard sets "a very high bar for any plaintiff" and that courts "should only in the rarest of circumstances and under the most coercive of conditions infer a tying arrangement."  *Id.*

In this case, the decline in purchases of Collins-brand Versamark ink that Collins will experience as a result of the July 2013 Policy is not clear.  On one hand, Kodak's expert attributes, at best, $339,000 in annual lost sales to Kodak, although Collins claims $724,777 in annual lost sales.  (DX186, ¶¶166-168; Tr. 3-24 – 3-25).  Yet, the data may be skewed given that Kodak has not treated all customers equally under that Policy, and some of its large customers continue to receive rebates for refurbishment, even though they continued to purchase Collins-brand Versamark ink.  Of relevance though is that many customers have committed to switch to Kodak or have informed Collins it must switch to Kodak since Kodak began announcing the change in refurbishment rates, even before full implementation.  Indeed, some documentation exists that Kodak had captured or was close to capturing three customers that accounted for 50% of Collins' annual Versamark ink volume, although it appears two of those customers still have continued to purchase some Collins ink.  (PX6; Tr. 2-8 – 2-9).  Other documentation provides some evidence that eight customers have switched as a result of the policy in a market where the parties seem to agree that the top 20 customers comprise the majority of the business.  (*See*

14

DX186, Ex. 14). While there also is some evidence that Collins may have gained business from two small customers since the policy was announced and that it made sales after the May 2012 Policy to one significant customer with which Collins had built a relationship for those sales prior to the May 2012 Policy announcement, the result after the enforcement of the policy remains to be seen. (DX186, Ex. 15; Tr. 1-99 – 1-100). As such, the actual percentage of decline in purchases of Collins-brand Versamark ink remains uncertain, but there is evidence to show a trend of declining sales even without full implementation of the policy. *See Tire Sales Corp. v. Cities Serv. Oil Co.*, 637 F.2d 467, 474 (7th Cir. 1980) ("An oil company's threat to cancel a franchisee's lease is overt coercion whether it is ultimately acted upon or not.").

Kodak suggests the Court also should consider two other factors in determining whether all rational buyers would be induced to use Kodak-brand Versamark ink. First, it suggests using a cost-based approach. In particular, Kodak suggests that the Court should consider whether Collins could offset the higher Kodak refurbishment charge for its customers while staying above its average variable cost. In support, Kodak relies on *Cascade Health Solutions v. PeaceHealth,* 515 F 3d 883 (9th Cir. 2008). As Kodak appears to acknowledge, *Cascade* applied its cost-based standard in the context of Section 2, rather than in the context of Section 1, of the Sherman Act, as did the other cases upon which Kodak relies. *Cascade,* 515 F 3d at 900-10; *see also Spirit Airlines, Inc. v. Northwest Airlines, Inc.*, 431 F.3d 917, 938-47 (6th Cir. 2005) (using the average variable cost of the defendant to determine whether its costs were predatory under Section 2 of the Sherman Act); *Valassis Commc'ns, Inc. v. News Am. Inc.*, No. 2:06-cv-10240, 2011 U.S. Dist. LEXIS 66672 (E.D. Mich. Jan. 24, 2011), *report and recommendation adopted by*, 2011 U.S. Dist. LEXIS 63495 (E.D. Mich. June 15, 2011) (relying on *Cascade's* attribution test for bundling discounts, and finding incremental variable costs to be the appropriate measure

to determine predatory pricing).  While Kodak may be correct that the average variable cost is the appropriate measure for predatory pricing in the context Section 2 of the Sherman Act, it has set forth no explanation as to why that same standard is applicable under Section 1 of the Sherman Act when considering whether "all rational buyers" would be induced to use its tied product.  The cost-based approach focuses on what Collins can do and not on what a *rational buyer* would do given the circumstances presented to it.

Assuming, however, that the standard is applicable, the *Cascade* court indeed relied upon the average variable costs in determining the anti-competitive effect of bundling discounts, but, in contrast to Kodak's argument, it did not look at whether  the *actual plaintiff* could offset the defendant's pricing on the bundle.  *Cascade,* 515 F 3d at 900-10.  Instead, it looked at whether *the defendant* priced the competing product below *its* average variable cost after attributing the entire discount offered on the bundle of goods to the product on which the plaintiff and defendant compete.  *Id.*  It determined that was the appropriate measure for determining whether a more efficient producer of the product at issue would be priced out of the market, not whether the actual competitor could continue to compete.  *Id.*  As such, in contrast to the argument set forth by Kodak, it would be necessary to look at *Kodak's* average variable costs rather than the plaintiff's to determine whether Collins could reasonably continue to compete.  There is no evidence presented to the Court about whether Kodak priced above its average variable cost when the discounts are applied as they are under *Cascade*.  Although the economics may show that Collins in particular may be able to discount prices to a level above "average variable cost," there also is evidence that suggests that for some customers Collins could give away the ink for free and still not offset the price differential (Tr. 2-39).  In any event, while that evidence may be

factored into the overall consideration, the *Cascade* court emphasized that it is the defendant's cost on which we should focus.

Finally, Kodak also urges the Court to consider whether a rational buyer would be induced to change in light of Collins' alleged product differentiation – that is, in light of Collins' reputation and the quality of Collins-brand Versamark inks.   Although Kodak emphasizes that quality and customer service may factor into whether Collins' customers are willing to bear higher refurbishment plus ink costs to stay with Collins ink, there is no evidence before the Court that specifically indicates any customers would be more concerned with quality and customer service than TCOP.  While the Court could infer that some customers desire to stay with Collins if economically feasible and that some have attempted to do so while Kodak has been lax on enforcing its policy, that does not mean that when push comes to shove the customers will decide based upon quality and customer service rather than on TCOP.  Indeed, both parties are adamant that TCOP is a significant, if not the primary, concern of the customers in deciding which brand of ink to use.

Thus, while other factors could come into play where there is a less significant price differential, the Court viewing the evidence as a whole and considering the importance of TCOP, finds that the price differential in the end fairly could be considered as inducing all rational buyers to switch to Kodak-branded Versamark ink.

### b. Factor Three:  Market Power

The next element of an unlawful tying arrangement is appreciable market power in the tying market.  "[M]arket power in the tying product market is an indispensable requirement under either per se or rule-of-reason analysis." *PSI Repair Servs.*, 104 F.3d at 815 n.2.  "'Market power is the power to force a purchaser to do something that he would not do in a competitive

market.'" *Id.* at 817 (quoting *Eastman Kodak*, 504 U.S. at 464) (additional internal quotations omitted). "It has been defined as the ability of a single seller to raise price and restrict output [and] [t]he existence of such power ordinarily is inferred from the seller's possession of a predominant share of the market." *Id.* (quoting *Eastman Kodak*, 504 U.S. at 464) (internal quotations and citations omitted). "[W]ithout market power, a seller cannot engage in the forcing necessary to establish a § 1 violation." *Id.*

The first issue to address is the relevant market definition. Kodak contends that the market should be defined as the primary equipment market, whereas Collins contends that the relevant market is the derivative aftermarket. While the primary and aftermarket may comprise a single relevant product market when competition in the primary market will restrain the power in the aftermarket, the derivative aftermarket may be the relevant market in certain circumstances. *Eastman Kodak*, 504 U.S. at 470, n. 15, 466, 477; *PSI Repair*, 104 F.3d at 817-21. The Supreme Court has set forth a framework for determining whether competition in the primary equipment market prevents a company from possessing the requisite market power in the aftermarket. *Eastman Kodak*, 504 U.S. at 466, 477; *see also PSI Repair Servs., Inc.*, 104 F.3d at 817-21. First, the Court must consider whether there are significant information costs. *Eastman Kodak*, 504 U.S. at 466, 477. "Information costs are costs that prevent consumers from obtaining all relevant information about a product at the time of sale." *PSI Repair Servs., Inc.*, 104 F.3d at 818 (citing *Eastman Kodak*, 504 US. at 477). Second, the Court must consider whether there are significant switching costs. *Eastman Kodak*, 504 U.S. at 466, 477. "Switching costs are borne by customers who have already purchased a product and who would then incur some cost in switching to another product." *PSI Repair Servs., Inc.*, 104 F.3d at 818 (citing *Eastman Kodak*, 504 US. at 477). Switching costs, if significant, can "lock-in" a purchaser in the primary

18

equipment market to the use of aftermarket goods.  *Id.*  Market power can be enhanced when a customer is "locked in."  *Id.*

Having reviewed the parties' arguments and evidence, the Court finds that Collins has demonstrated a likelihood of success in proving that the market should be defined as the derivative aftermarket.  While the equipment market is undisputedly competitive, neither the tied nor the tying product in this case is equipment.  Instead, both the tied and the tying product exist in the aftermarket.  It thus is necessary to consider the relevant factors.

Regarding information costs, the Supreme Court has recognized that consumers must be able to accurately engage in lifecycle pricing at the time of purchase.  *Eastman Kodak*, 504 U.S. at 473-74.  Recognizing that determining lifecycle costs of complex durable equipment may be difficult, the Supreme Court did not require that consumers have exact knowledge of every potential cost facing them at the time of purchase.  *Eastman Kodak*, 504 U.S. at 473-74.  Instead, sellers in the equipment market must be forthcoming about its pricing structure and service policies at the outset of its sale.  *PSI Repair Servs.*, 104 F.3d at 820.  Although there may be information costs that exist even with full disclosure by a seller, those additional costs should not be condemned under the antitrust laws.  *Id.* (citing Mark R. Patterson, *Product Definition, Product Information, and Market Power: Kodak in* perspective, 73 N.C. L. Rev. 185, 215-16 (1994)).  Yet, the Sixth Circuit has viewed with disfavor changes in aftermarket policy after the consumer's initial purchase of the complex durable equipment.  *See id.*  It reasoned that when a unilateral policy change occurs after purchase of which customers would not generally have known about at the time of purchase, the information costs may be high even for sophisticated customers.  *PSI Repair Servs., Inc.*, 104 F.3d at 819-21; *see also Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 382-83 (3d Cir. 2005).

During the time Kodak sold its Versamark printers, customers were charged the same rate for Kodak's refurbishment services regardless of whether they used Kodak-brand or Collins-brand Versamark ink.  The May 2012 Policy and the July 2013 Policy changed that by imposing higher costs for Versamark refurbishment services on those customers using Collins-brand, rather than Kodak-brand, Versamark ink.  While evidence in the record suggests that Versamark customers are sophisticated, are highly concerned with TCOP, have some negotiating leverage, and possibly could have anticipated a change in ink prices, there currently is no evidence that suggests that the customers knew or could have expected that at some later time they would be charged a much higher rate for refurbishment services based upon the brand of ink that they used.  In other words, most customers did not reasonably have pre-purchase knowledge of Kodak's new refurbishment pricing policy.  *See PSI Repair Services*, 104 F.3d at 820-21.  Nor has any evidence been presented that suggests that the customers had knowledge concerning how they were impacted by the agreement between Kodak and Collins, or any other knowledge from which they could reasonably anticipate such a tie in the future should the relationship between Collins and Kodak deteriorate.  *See id.*  Rather, the evidence suggests that Kodak's May 2012 or July 2013 Policy was not generally known at the time customers purchased Versamark printers, since neither was in existence or even contemplated at the time of those purchases.[3]  As such, Collins has raised a serious and substantial question as to whether there are significant information costs to the large base of Versamark printer customers.

Likewise, Collins has raised a serious and substantial question as to whether there are significant switching costs to the large base of Versamark printer customers.  In *Eastman Kodak*, the Supreme Court recognized that customers' "heavy initial outlay for Kodak equipment,

---

[3] The last purchase of a Versamark printer occurred in 2009, long before the introduction of the May 2012 Policy or July 2013 Policy.

combined with the required support material that works only with Kodak equipment, [made] switching costs very high for existing Kodak customers." 504 U.S. at 477. Similar to *Eastman Kodak*, the evidence shows that there is a heavy initial outlay for the primary Versamark printers. The customers purchase those printers with an expectation that they will last anywhere from 10 to 20 years. Although the lifespan of some of those machines are in decline, the printing industry itself also is in decline. It is likely that continuing to utilize a well-functioning machine that is already paid for, rather than investing in new expensive equipment with the latest and greatest technology, makes rationale sense for many customers, particularly where the profit margin on printing is small. There also is evidence that Versamark ink customers have invested time and money into training their employees on the Versamark printers and related equipment. Thus, replacing the Versamark printers would require not only the purchase of new comparable equipment, which may cost more than a million dollars, but also an investment of time and money into training its employees on the new equipment. The evidence suggests that many customers would have to replace multiple Versamark printers to completely transition away from that equipment market, which would require additional investments into equipment and support material.

As for actual switching, there is evidence that several Versamark customers have or would switch to new equipment. Specifically, Kodak cites to one large customer, DST. It is not clear as to the specific reasons customers are switching, or that other customers would have the same perspective or financial abilities to switch. The fact that a select few customers have or are able to switch does not necessarily demonstrate that switching costs are not significant for the majority of the customers. It certainly is notable that even after Kodak increased the price of refurbished printheads for 40% to 50% of its customers, there is little evidence of switching

presented. It therefore appears that given the high switching costs, most customers are willing to tolerate even a high service-price increase before being able to justify the switching costs.

Although Kodak insists that its need to retain customers to sell its new Prosper equipment in the future keeps it disciplined in the aftermarket such that the equipment market should be the relevant market, there are several factors that suggest such sales in the new equipment market are not enough to continue disciplining the aftermarket. In particular, there is evidence that the printing industry as a whole is declining. There also is evidence that Kodak recently has emerged from bankruptcy and that suggests Kodak has some need for immediate revenues to fund its future operations. Such financial need provides an incentive to exploit its market power now. Perhaps more importantly, Kodak already has significantly increased the price of refurbishment services and continues to impose its policy to the dissatisfaction of many of its customers, which undercuts its argument that it is constrained by the responses of its customers in its ability to raise prices in the aftermarket. *See Kodak*, 504 U.S. at 477.

Turning now to Kodak's market share in the tying market, the Sixth Circuit has recognized that the existence of market power (the ability of a single seller to raise price and restrict output) "ordinarily is inferred from the seller's possession of a predominant share of the market." *PSI Repair Servs., Inc.*, 104 F.3d at 817. Currently, Kodak possesses a 100% share of the tying market for refurbished Versamark printheads. That market share is more market share than the 30% share found insufficient by the Supreme Court. *Jefferson Parish,* 466 U.S. at 26-27. Although Kodak insists that its market share will be diminished when Collins enters into the tying market, that threat of future entry does not diminish Kodak's current market share. As such, it can be inferred that Kodak currently has market power in the tying market. *See PSI Repair Servs., Inc.*, 104 F.3d at 818.

However, instead of relying on market share alone, the Court also factors in the market realities that show that Kodak has the ability to raise prices or impose other burdensome terms with respect to an appreciable number of buyers within the market. *See Bell v. Cherokee Aviation Corp.*, 660 F.2d 1123, 1128-29 (6th Cir. 1981). As Collins' expert points out, there is a large installed base of Versamark customers that is dependent upon Versamark refurbished printheads. Kodak's pricing policy raises costs to levels where customers are dissatisfied, yet minimal evidence of switching has been presented. Those customers thus may very well be locked-in to their Versamark printers for the time being and unable to react as they would in an ordinary marketplace to an increase in prices. That alone may be sufficient to show the requisite market power. *See Virtual Maintenance II,* 11 F.3d at 666-667.

Another factor weighing into the Court's assessment are the barriers to entry into the Versamark printhead refurbishment market. Here, Collins has presented evidence that Kodak has been the sole provider of Versamark printhead refurbishment services since its introduction of the Versamark printer. No other companies have been able to enter that market previously, as the refurbishment requires replacement of "Kodak proprietary parts that took engineers years to develop[,]" which are "not for sale" and which have "no substitutes." (PX44). Although Collins now is attempting to enter that market, its entry has taken a significant amount of time and money, and there still is uncertainty surrounding whether or when it may be able to enter that market and when or if it will be able to offer the full range of refurbishment services offered by Kodak. (Tr. at 1-14 - 17, 1-129). Thus, there not only has been no actual entry into the market, there also has not been any capture of market share by Collins. While Kodak may contend that Collins' potential future entry into the market restrains prices, the Court reiterates that Kodak already has increased the refurbishment prices significantly for non-Collins customers so as to

23

exercise its market power while avoiding any direct competition on price with Collins in the Versamark ink aftermarket.

Accordingly, Collins has satisfied its burden at the preliminary injunction stage in regards to Kodak's market power in the tying market.

        c.    Factor Four: Substantial Volume of Commerce in Tied Market Affected

To prove a per se tying violation, the plaintiff must show that a substantial amount of commerce is foreclosed in the tied-product market. *Fortner Enters. v. United States Steel Corp.*, 394 U.S. 495, 501, 89 S. Ct. 1252, 22 L. Ed. 2d 495 (1969). Normally, the focus is on whether the dollar-volume of business foreclosed is merely de minimis rather than on the percentage of the relevant market foreclosed. *Id.* That means that the relevant figure is the total volume of sales tied by the sales policy under challenge, not the portion of this total accounted for by the plaintiff who brings suit. *Id.* There is not a clear demarcation as to when the volume of commerce affected is sufficiently substantial to satisfy this requirement; however, courts have found amounts anywhere in between approximately $10,000 to $400,000 to be sufficient to satisfy this element. *See, e.g., Tic-X-Press, Inc.*, 815 F.2d at 1407 (held $10,091.07 in lost sales by plaintiff was a sufficiently substantial volume of commerce); *Falls Church Bratwursthaus, Inc. v. Bratwursthaus Mgmt. Corp.*, 354 F. Supp. 1237, 1240 (E.D. Va. 1973) ($400,000 held to be sufficient).

Here, the sales in the tied product – Versamark ink – involve millions of dollars, and there is evidence that suggests Collins has lost over $300,000 in sales since the announcement of the refurbishment policy. Without question, those are not insubstantial amounts of commerce affected by the tie.

        d.    Legitimate Business Justification

Section 1 is not violated, however, where the defendant has legitimate business justifications for its conduct. The legitimate business justification defense has been recognized both in the context of per se and rule of reason tying cases under Section 1. *See Virtual Maintenance I*, 957 F.2d at 1323 ("Even if a per se violation is established, a defendant may prevail by showing a substantial business justification."); *Expert Masonry, Inc. v. Boone Cnty.*, 440 F.3d 336, 343 (6th Cir. 2006) (considering legitimate business justifications under a Section 1 rule of reason analysis).[4]

Kodak contends that it has two legitimate business justifications that preclude a finding of an unlawful tie: 1) maintaining revenue to sustain ongoing service operations; and 2) protecting its reputation for quality service and equipment. For the reasons explained below, the Court views both asserted business justifications with skepticism and does not find that they preclude a finding of a likelihood of success on the merits of the tying claim.

With its first business justification, Kodak seeks to convince the Court that the significant increase in refurbishment costs for non-Kodak ink customers will cover the costs it may have to incur because of its inability to collaborate with Collins to resolve problems that may be traced to Collins ink. In other words, it wants to prevent Collins from "free-riding" on its service program

---

[4] While it seems paradoxical to permit a legitimate business justification to a per se tying claim given that a per se claim of illegality generally does not permit such justifications or defenses, courts nonetheless have considered such defenses in the per se context. One court has offered the following explanation:

> It may seem somewhat anomalous to permit justifications for arrangements that are apparently subject to per condemnation. However, per se rules are simply examples of presumptions that exist throughout antitrust law, and "easy labels do not always supply ready answers." *Broadcast Music, Inc. v. Columbia Broadcasting Sys., 441 U.S. 1, 8, 60 L. Ed. 2d 1, 99 S. Ct. 1551 (1979).* Before applying the per se label we must determine whether the challenged practice is one of those types that "is 'plainly anticompetitive' and very likely without 'redeeming virtue.'" *Id.* at 9. Allowing the defendant to assert a business justification defense is one way of inquiring into whether the reasons for the relatively categorical historical condemnation of tie-ins apply to the challenged arrangements.

*The Mozart Co. v. Mercedes-Benz of North America, Inc.*, 833 F.2d 1342, 1349 n. 5 (9th Cir. 1987).

for its customers. Courts generally have rejected "free-riding" as a business justification for tying arrangements. *See, e.g., Eastman Kodak*, 504 U.S. at 485; *Metrix Warehouse, Inc. v. Daimler-Benz Aktiengesellschaft*, 828 F.2d 1033, 1041 (4th Cir. 1987).[5] Going beyond the general rejection of free-riding as a business justification, however, the Court also is skeptical due to the lack of explanation as to the connection between the increased refurbishment costs and the costs associated with the alleged free-riding. Indeed, Kodak has not detailed how the cost of the anticipated support to resolve problems that may be traced to Collins' ink justifies the specific increase in refurbishment costs. There is testimony that the Versamark ink and refurbishment customers are sophisticated. As such, identifying ink problems for Collins customers may not be as time-consuming or costly as Kodak suggests. Moreover, the number of Collins ink problems does not appear to be a regular occurrence so as to require an across-the-board price increase for all Collins-ink customers regardless of whether they actually incur a problem that could possibly be related to Collins ink. Thus, while free-riding may be a real concern of Kodak's, the rational connection between the price increases and the concern is not apparent nor is the Court convinced that it is the least restrictive means of addressing that concern. Thus, the Court is not persuaded at this stage that the conduct is justified so as preclude a finding of an unlawful tie.

As for Kodak's second proffered business justification, the Court cannot say the proffered reason is genuine or sufficient to preclude a finding of an unlawful tie. The evidence supports a finding that the purported quality concerns with Collins-brand Versamark ink were either non-existent or were so minimal that they did not actually justify the imposition of a policy aimed at preserving reputation for quality. As explained above, the evidence that the Collins-brand

---

[5] Where courts have accepted free-riding as a justification, it has been in the context of *intra*brand free-riding occurring between different retailers of the same brand of a product. *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984) (sale of manufacturer's herbicide at issue); *Continental T.V. v. GTE Sylvania*, 433 U.S. 36, 53 L. Ed. 2d 568, 97 S. Ct. 2549 (1977) (sale of one brand of televisions at issue). That is not the situation here.

Versamark ink causes printhead damage and decreases service life is weak and to some extent, is contradicted by statements made by Kodak's own personnel. (*See* PX27). There also is substantial evidence in the case that suggests that Collins' reputation for quality ink is equal to or superior than Kodak's reputation for quality. (*See, e.g.*, Tr. at 1-23, 2-24; PX24; PX25; PX26; PX29; PX93; PX 137). Indeed, for numerous years Kodak "approved" Collins as a Versamark ink supplier during which time Collins-brand Versamark inks performed well overall in the Versamark systems. (*See* PX27). It was not until after Collins terminated the agreement that Kodak decided Collins-brand ink could not be trusted.

Further, the notion that Kodak will be blamed for problems associated with third party products has been dispelled by the Supreme Court. In *Eastman Kodak*, the Supreme Court found inconsistent Kodak's argument that the customers sufficiently sophisticated to make complex lifecycle-pricing decisions were not sophisticated enough to distinguish between different types of breakdowns and place the blame on the appropriate supplier. *Eastman Kodak*, 504 U.S. at 484 ("Thus, Kodak simultaneously claims that its customers are sophisticated enough to make complex and subtle lifecycle-pricing decisions, and yet too obtuse to distinguish which breakdowns are due to bad equipment and which are due to bad service."). The same is true here. Although Kodak may bear the burden of some problems that are outside of its control, the sophisticated customer ultimately will be able to distinguish between the different breakdowns. The record as a whole therefore casts doubt on the legitimate business justifications of Kodak.

### 2. Lanham Act and Ohio Deceptive Trade Practices Act

To prove a claim for false advertising or commercial disparagement under either the Lanham Act or the Ohio Deceptive Trade Practices Act, a plaintiff must establish that: "1) the defendant has made false or misleading statements of fact concerning his product or another's; 2) the statement actually or tends to deceive a substantial portion of the intended audience; 3) the

statement is material in that it will likely influence the deceived consumer's purchasing decisions; 4) the advertisements were introduced into interstate commerce; and 5) there is some causal link between the challenged statements and harm to the plaintiff." *Herman Miller, Inc. v. Palazzetti Imps. & Exps., Inc.*, 270 F.3d 298, 323 (6th Cir. 2001); *see also Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 626 (6th Cir. 2002) ("Both Ohio and federal courts have recognized that the same analysis applies to claims under Ohio's statutory and common law of unfair competition and the Lanham Act.").  If a plaintiff proves that the statements were literally false, the plaintiff may prevail without evidence that the false statements actually misled consumers because actual deception is presumed." *LidoChem, Inc. v. Stoller Enters.*, 500 F. App'x 373, 380 (6th Cir. 2012).  If a statement is not literally false, or is true but misleading, a plaintiff seeking injunctive relief must show "that the defendant's representations about its product have a tendency to deceive consumers."  *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 613-14 (6th Cir. 1999).

Having reviewed the statements at issue, the Court finds that Collins has not demonstrated a likelihood of success on the merits of the Lanham Act and ODTPA claims.  To the extent the claims are based upon statements made in May 2012 and June 2012, those claims likely are barred by a one-year statute of limitations since they were published more than one year prior to the filing of the Complaint on September 19, 2013.  *See Lasmer Indus. v. AM Gen., LLC*, 741 F. Supp. 2d 829, 838-39 (S.D. Ohio 2010) (applying the one-year statute of limitations for defamation to claims based upon disparaging statements made under the ODCPA).

Further, the evidence at this stage is insufficient to show a likelihood of success on the merits.  First, Collins points to a statement in Kodak's May 3, 2012 Press Release that "[o]nly

Kodak" can assure that inks are "engineered, print tested, and optimized for system fluid consumption prior to customer order." (PX18). At best, this statement is either ambiguous or true but misleading. It is unclear what it means to be "optimized" and whether "print tested" encompasses or is distinguishable from the "predictive testing" or other quality testing performed by Collins. Thus, Collins must introduce evidence of a tendency to deceive consumers.

Second, Collins relies on the statement in Kodak's May 3, 2012 Press Release that customers received the "highest levels" of "optimized system performance" or "optimal printing performance" when using Kodak inks. (PX18). The references are imprecise and appear to be subjective puffery or opinion that is not actionable under the Lanham Act or ODTPA. *See Interactive Prods. Corp. v. A2z Mobile Office Solutions, Inc.*, 326 F.3d 687, 699-700 (6th Cir. 2003) (statements that a product is "redesigned and improved" constituted unactionable opinions); *Outdoor Techs. v. Vinyl Visions,* No. 1:06-cv-044 2006 U.S. Dist. LEXIS 73337, at *9-17 (S.D. Ohio Sept. 29, 2006) ("most weatherable" and "strongest warranty" generally are non-actionable puffery or opinions).

Third, Collins contends that Kodak's May 3, 2012 Press Release as a whole was misleading because it implied that Kodak revoked approval of Collins-brand Versamark ink for quality or performance reasons. Although this claim also is likely barred by the one-year statute of limitations, *see Lasmer*, 741 F. Supp. 2d at 838-39, the argument is that it is misleading rather than literally false. As such, Collins must introduce evidence that it tended to deceive customers.

Fourth, Collins points to the May 23, 2012 letters to Collins' customers that state "non-Kodak-brand inks and fluids can *potentially* disrupt and damage printing components, system operations, and color matching/color management." (PX217). Collins concedes that the wrong ink could damage a Versamark system such that the statement could be true. (Tr. 1-8). In any

event, the statement also is speculative, qualified and unverifiable. It may be misleading, however, to the extent it untruthfully suggests that Collins-brand Versamark ink regularly causes such disruptions or damages or that the risk is greater with Collins-brand Versamark ink than with Kodak-brand Versamark ink. However, there is insufficient evidence at this time plainly supporting the untruthfulness of that statement. In any event, Collins still must introduce evidence that the statement tended to deceive consumers.

Fifth, Collins relies on the June 11, 2012 slide presentation statement that "[a] matched system delivers a lower TCOP through more printed pages, increased print quality, and greater reliability." (PX217). To the extent that statements are verifiable, Collins' evidence as to its falsity lacks objectivity, and offers only opinions and some references to customer statements that Collins performs better in those respects. (*See* Doc. 33-2, ¶25). That is not enough to show a likelihood of success on the merits.

Sixth, the statement in the June 11, 2012 slide presentation about Kodak inks being "pure and free from particles, bacteria and other contaminants that can cause catastrophic failure" also could be verifiable. (PX217). Collins, however, has not introduced sufficient evidence to show the statement literally is false. Its anecdote about one incident where Kodak had an issue with bacteria, while suggestive of its falsity, lacks specific details or objective information to prove its falsity. The implication that Collins-brand Versamark inks do not have these qualities also potentially could be misleading. However, the evidence as to these qualities in Collins-brand Versamark ink is scarce and insufficient to satisfy its burden at this stage. In any event, Collins also must show as to the latter implication that the statement had a tendency to deceive customers.

Seventh, although not included in their argument in its Amended Motion for a Preliminary Injunction (Doc. 33), Collins contends that false statements were made in July 24, 2013 and September 5, 2013 letters from Kodak to its customers.  (PX54; PX66).  Those letters inform Kodak customers that "over the last six months, our customers have experienced damaged printheads as a direct result of using third party inks and fluids."  (PX54; PX66). Kodak stated that the basis for the statement was the printhead issues experienced by DST in December 2012.  (PX 55).  A representative of DST testified that it had not experienced printhead damage as a direct result of Collins-brand Versamark ink.  (Smith Tr. at 98-109). Kodak has set forth contradictory evidence that it determined that yellow residue inside the printhead caused the printheads to fail and that the residue did not stem from any material used in any Kodak fluid or in the manufacture of the printhead.  (DX75; Tr. 2-237).  Kodak determined that Collins ink had been run through the printheads.  (DX76; Tr. 2-228).  Given that conflicting evidence, the Court cannot determine that Collins has shown a likelihood of success in proving that the statements literally were false, even if they were based on weak evidence.[6]

Finally, Collins also strays from its briefing by arguing that Kodak's powerpoint presentation from November 2013 forms the basis for its claims.  Although Collins claims that four statements included therein are false, the evidence on which Collins relies in support is scant.  That evidence includes testimony as to the "tighter specifications" of Collins-brand Versamark ink, and the "minor modifications" made by Collins to optimize print quality.  (Tr. 1-39-40).  Yet, there is no evidence from which to actually compare the effects of Collins-brand ink versus Kodak-brand ink on quality or the number of incidents occurring as a result of each.

---

[6] That evidence also is relied upon to support Kodak's legitimate business justification under the Sherman Act.  There, the Court finds the evidence, even if viewed in favor of Kodak, is weak, such that it is insufficient to preclude a likelihood of success on the Sherman Act claim.  Here, however, the focus of the Lanham Act and the ODPTA claim is the falsity of the statement.  The conflicting evidence precludes a finding of likelihood of success on the merits at this stage.

Although the Court may ultimately agree with Collins that these statements are false, the evidence currently before the Court is insufficient to conclude at this time that Collins is likely to succeed on the merits of proving these statements are actionable under the Lanham Act or the ODTPA.

In considering all of the above challenged statements, the Court keeps in mind that Collins must show as to the ambiguous, and the true but misleading, statements that there was a tendency to deceive the customers.  There currently is insufficient evidence before the Court as to such a tendency to deceive the customers.  Notably, Collins argued that such evidence was not necessary because the statements literally were false.  As such, that lack of evidence provides another ground on which to determine Collins has not demonstrated at this stage a likelihood of success on the merits.

Accordingly, as a whole, Collins has not shown a likelihood of success on the merits of its Lanham Act and ODTPA claims.

       3.  <u>Defamation</u>

The elements of a defamation claim under Ohio law are: "1) a false and defamatory statement; 2) about the plaintiff; 3) published without privilege to a third party; 4) with fault or at least negligence on the part of the defendant; 5) that was either defamatory per se or caused special harm to the plaintiff." *MedChoice Fin., LLC v. ADS Alliance Data Sys.*, 857 F. Supp. 2d 665, 673 (S.D. Ohio 2012) (citing *Thomas v. Cohr, Inc.*, 197 Ohio App. 3d 145, 151 (1st Dist. 2011)).  Only factual statements can be defamatory. *Harris v. Bornhorst*, 513 F.3d 503, 522 (6th Cir. 2008) (citing *Vail v. Plain Dealer Publ'g Co.*, 72 Ohio St. 3d 279 (1995), *cert. denied*, 516 U.S. 1043 (1990)).  In determining whether statements are factual statements or expressions of opinion, Ohio courts use a totality-of-the-circumstances test that considers the "specific language

32

used, whether the statement is verifiable, the general context of the statement, and finally, the broader context in which the statement appears." *Id.* (internal quotations omitted).  Expressions of opinion, however, may often imply an assertion of fact.  *Id.*  Those implied assertions of fact may be actionable.  *Id.*

As the defamation claim is based upon the same statements set forth above as to the Lanham Act and ODTPA claims, the Court adopts the same reasoning here.  Accordingly, Collins has not demonstrated a likelihood of success on the merits.

### 4.  Tortious Interference

A claim for tortious interference with a business relationship under Ohio law requires proof that one, "without privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation" with the plaintiff.  *Havensure, LLC v. Prudential Ins. Co. of Am.*, 595 F.3d 312, 315 (6th Cir. 2010) (citing *A & B Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St. 3d 1, 14 (1995)).   Ohio courts consider seven factors in evaluating the claim:  1) the nature of the actor's conduct, 2) the actor's motive, 3) the interests of the other with which the actor's conduct interferes, 4) the interests sought to be advanced by the actor, 5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, 6) the proximity or remoteness of the actor's conduct to the interference, and 7) the relations between the parties.  *Id.* (citing *Fred Siegel Co. v. Arter & Hadden*, 85 Ohio St. 3d 171, 178-79 (1999)).

As explained above, Collins has demonstrated a likelihood of success on the merits on the antitrust claim.  If that claim ultimately is proven, Collins will have shown that Kodak acted unlawfully to restrain trade.  While the exact motives of Kodak are not clear, there is sufficient evidence to suggest the motive was to induce customers to use Kodak-brand Versamark ink

rather than the Versamark ink of its sole competitor Collins, and it did so by adopting the refurbishment policies.  Further, there is sufficient evidence at this stage of the loss of Collins-brand Versamark ink sales following the announcement of the new refurbishment policies by Kodak. All of that evidence is sufficient at this stage to show a likelihood of success on the merits of the tortious interference claim.

### B.  Irreparable Harm

The second factor of the preliminary injunction analysis considers whether Collins would suffer irreparable injury without the injunction.  As the Sixth Circuit has explained, "[a] plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Certified Restoration Dry Cleaning Network*, 511 F.3d at 550 (internal quotations omitted).  Nevertheless, "an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make the damages difficult to calculate." *Id.* (internal quotations omitted).  A "loss of business goodwill may constitute irreparable harm because of the difficulty in calculating damages." *Langley v. Prudential Mortg. Capital Co., LLC*, 554 F.3d 647, 649 (6th Cir. 2009).

Here, there is evidence that allowing Kodak to continue implementation of its policy will result in lost sales and other irreparable harm to Collins.  Even without full implementation, evidence suggests Collins potentially has lost a significant amount of sales.  That loss in sales, however, can be compensated monetarily.  Other irreparable harm is not so readily compensable.  For one, the case is about competing products and market share.  The improper loss of market share may constitute irreparable harm to Collins.

Perhaps even more significant is that Collins will suffer damages to its workforce who may be difficult to replace, and is likely to see its goodwill and reputation suffer due to its

inability to satisfy customer needs. The Versamark ink business is not an insignificant portion of Collins' overall business, and Collins has been producing that ink for a substantial amount of time. The loss of sales and customers thus does more damage to the goodwill and reputation of Collins than can be quantified. There also is evidence that there will be a spillover from the lost sales that will preclude continued attempts to enter into the refurbishment market. All of these constitute irreparable harm to Collins. *See Tri County Wholesale Distribs. V. Labbatt USA Operating Co., LLC*, No. 2:13-cv-317, 2013 U.S. Dist. LEXIS 148832, at *45-48 (S.D. Ohio Oct. 16, 2013).

This factor weighs in favor of Collins.

### C.  Substantial Harm to Others

The third factor is substantial harm to others. If a preliminary injunction is not granted, some customers will have to pay exceptionally higher prices for refurbishment in order to stay with Collins as their first-choice ink supplier. If, however, a preliminary injunction is granted, some Kodak customers may have to pay more for refurbishment than they currently are paying under the policy. It also is possible that all customers will have to pay more for refurbishment than they did prior to introduction of the pricing policy because Kodak may institute an across-the-board price increase. Kodak also will be directly impacted financially by a preliminary injunction, and may suffer harm to its reputation.

Overall, this factor is evenly balanced as to the customers, but tips slightly in favor of Kodak given its potential losses and reputational harm.

### D.  Public Interest

The fourth and final factor to consider is whether the public interest would be served by granting injunctive relief. Although Kodak contends that the injunction would harm the

competitive process, the Court disagrees.  Given the above conclusions, the injunction will promote fair competition and continue to provide consumers with real choices in its suppliers of Versamark ink, which both are in the public interest.  *FTC v. ProMedica Health Sys.*, No. 3:11-cv-47, 2011 U.S. Dist. LEXIS 33434, at *160-61 (N.D. Ohio Mar. 29, 2011).  It also will preclude customers from experiencing improper interference in their business relationships.  Accordingly, this factor weighs in favor of Collins.

## IV.    CONCLUSION

The balance of equities in this case weighs in favor of Collins given its likelihood of success on the merits of Sherman Act and the tortious interference claims, the potential for irreparable harm, and the public interests to be served.  Accordingly, Collins' Motion for a Preliminary Injunction (Docs. 2, 33) is hereby **GRANTED**, and the status quo shall be restored.  In this case, the status quo requires non-differential pricing of Kodak's Versamark printhead refurbishment services for Collins-brand Versamark ink and Kodak-brand Versamark ink customers.  Unless otherwise ordered by the Court, the preliminary injunction shall remain in effect for six (6) months from the date of entry of this Opinion and Order.  Bond is set at $100,000.

**IT IS SO ORDERED.**

s/Michael R. Barrett
Michael R. Barrett, Judge
United States District Court